The next case, number 24-9002, PCC Rokita, S.A. v. HH Technology Corp. et al. At this time, would counsel for the appellants please introduce themselves on the record to begin. May it please the Court, Ilyas Rona on behalf of appellants PCC Rokita, Shanghai Morimatsu and DFT Properties. With the Court's permission, I'd like to reserve one minute for rebuttal. Okay. Thank you, Your Honor. I'm going to dive into the primary question for today, which is, does a bankruptcy judge have statutory authority to block a creditor from joining an involuntary petition when that attempt is before a hearing and therefore before dismissal? Where the statute in question, 11 U.S.C. 303C, confers a right on creditors to join a petition before the case is dismissed. And I'm going to try to cover a lot of ground, but I'm going to start with a plain language approach, touch on the history of the three-creditor rule, discuss Law v. Siegel and how that has, I think, tilted the way courts have to look at questions of statutory interpretation with the bankruptcy code, and then also talk a little bit about the canons of construction, some policy, and then finally waiver. But I'll start with maybe what's missing in 303C. What's missing in 303C is any language suggesting that there should be a deadline. The bankruptcy code has, and the rules themselves, have numerous instances where, for example, 11 U.S.C. 503 discusses whether an administrative claim is timely filed or tardily filed. Rule 7020, which is the corollary of Federal Rule 20, talks about a timely motion for, I apologize, I think that's 24, but a timely motion for intervention. So where the court is, where the rules expect a deadline, they delineate between those who are timely and those who are not. 303C doesn't contain any such language other than to say the intervention or the attempt to join has to be. But can't you read that? I mean, what's missing, and to reverse the way you presented it, what seems to be missing for me is if I added the words at any time, at the front, that would be helpful. At any time, meaning there's no limitation, this seems to put an outer boundary. It has to be before dismissal, but it doesn't say whenever. So you're asking to display sort of, I think, a background principle that judges get to sort of control how things play out in their court, and you say this language does it, and I wonder if it really does or if it just sets a boundary because it doesn't have that sort of at-any-time language. Well, and that's a good question. So that launches me into a little bit of the history of the three-creditor rule. This rule on involuntary proceedings is not something that Congress came up with whole cloth in the 70s. This was simply a codification of the existing rules under the Bankruptcy Acts. And we'll start with the Supreme Court case in Canute, which referred to when the statute had the language at any time, and so Your Honor's observation is a good one, but referred to it as a right thus conferred. And our brief lays out the chronology, including the most consistent line of cases, which is in this Federal Circuit, recognizing that there's a right to join. There's no congressional intent, whether in the legislative history, in the text of the statute, suggesting that Congress wanted to take away that right. So the First Circuit understood in Gooderman, in Vento, in Crown Sportswear going into the 70s, that this was a right to join. But I guess to get back to Judge Afrin's question, what do we do with this sort of competing rule that judges get to control the proceedings, what happens in their court and when it happens? Well, the Bankruptcy Code is very complicated, and there's three hands on the steering wheel. The debtor has a hand on the steering wheel, and for good reason. The unfortunate but honest debtor should have his or her rights protected. The second hand is creditors. Our economy relies on transparency and getting outcomes for creditors and not letting money disappear. The third hand is the bankruptcy judge. Bankruptcy judges have crowded dockets, a lot of procedure, a lot of administrative headaches, and everybody understands intuitively they should have some control over their docket. But Law v. Siegel says you've got to stack up statute versus statute, and if you have no statute against, you've got to look at the rule, and we know from the enacting statute that if the rule conflicts with the code, the code wins. Counsel, there's something really very odd about your argument in this sense. We are told that it's a big deal, this involuntary bankruptcy procedure. It's a big deal for obvious reasons. Because of that, there's a need to be able to move expeditiously in resolving the claims. On your reading of the relationship between the statute and the regulation, you could have a scenario where a lengthy hearing is held to determine the numerosity of the creditors. The hearing takes place, but there's been no order yet, no dismissal, and then a creditor petitions to join the original petition. Under your construction, that would be considered timely because there's been no dismissal or no order. That seems completely at odds with the emphasis on trying to resolve these claims expeditiously. That scenario that I've described under your reading would be quite realistic, would it not? Well, it would, Your Honor, and in fact, that's the scenario that the bankruptcy judge wanted in this case, in that when there were later disclosed creditors, so right at the second to last day of discovery, the debtor, recognizing they were going to fall under the 12-creditor threshold, asked one of the principals to find me more creditors. And he found four more creditors. And the judge, the appellants moved to exclude them from evidence. The judge denied that motion. Instead, what the judge did was allow those late disclosed creditors to join the petition in August. The first hearing date was in July. So I understand from a judicial perspective the idea of having a trial and then having the feeling that maybe the rug is pulled out from underneath you after, but that's the exact scenario that the bankruptcy judge in this case didn't seem to be put off by. And I would say that there are ways, I'm not a judge, but there are ways to still move things along, compress things. And I would say that the hearing, and this doesn't feature in the brief, but this is something that dawned on me preparing for today, is that the hearing was supposed to have some purpose. Before the days of ECF, the creditors would be amassed in the courtroom. And they would be listening to the debtor being examined. And they could have real concerns about ever seeing another penny, especially in a case like this where they discovered that there were over a million dollars of preference payments that, because of the assignment for the benefit of creditors, the assignee was never going to go and pursue those. That would be a very real concern to you. PCC has a million-dollar claim recognized by a federal judge in this courthouse, and there were a million dollars of preferences that went out, and there was no ability to recover that under the assignment. So the hearing, and the First Circuit in LaRoche in 1992 said there's no prejudice for a creditor joining at the hearing. So I guess a question I have then is, are you arguing that it was an abuse of discretion of the bankruptcy judge to assuming she can issue a claim? I mean, are you saying that she abused her discretion by doing that so early? I mean, there was no hearing date yet when she, May 23rd was before there was even a hearing date. It seems to me the hearing date is when we start to get into the scenarios of extra work, and at least you allege that your company learned about transfers that were suspicious in that period, and the judges were not. And the judge said, well, you could have learned that earlier. I mean, are you arguing that? Because it does seem somewhat harsh, I guess. Our argument is not based on the abuse of discretion standard. It's based on the denial of DFT attempting to join before the hearing. As a matter of statutory. As a matter of statute. And in this case, DFT, my brother's going to argue waiver. DFT didn't know that there had been a hearing set. They never got the notice, and that's clear from looking at the docket that the debtor was instructed to send a notice of the hearing to creditors, and that notice was not sent out or docketed. I'm going to turn to the second issue, if that's okay with the court, which is the question of allocation of responsibility and litigation. Can I just back up? Some of the creditors knew of the hearing of the date, though. I'm not sure what Your Honor is referring to. You're saying DFT didn't know. They didn't know at the time that they, at the time the deadline passed, they didn't know about it. There was no hearing, and at the time they joined, they hadn't gotten notice of the hearing date. I see. But Rokita is in a different position, right? Rokita is the original petitioner. Rokita has full knowledge. There's no claim about that. This is DFT attempting to do that. I know you need to get to this other point, and I think we'll certainly allow you to do that. I thought the procedural background indicates that DFT was well aware of the deadline for filing a petition, a motion to join the petition. They made a decision not to do that. They made a decision to participate in the assignment for the benefit of creditors process. Given that scenario, if that's correct, why isn't there a good argument for waiver? They made a conscious decision to go forward in one process outside of bankruptcy and not in another. They did not participate in the bankruptcy process. I know the bankruptcy panel treated it as a forfeiture, not a waiver, but why isn't there a real waiver issue here? Well, Your Honor, two parts to that answer. One, at the time that the involuntary was filed, DFT had no knowledge of it because there's no requirement of the debtor to give instantaneous notice to creditors of an involuntary petition. So PCC didn't know DFT existed. DFT didn't know the bankruptcy existed. So when they submitted the claim form, it was not an assent, it was a claim form. They had no idea that there was a bankruptcy. Two. What is the purpose of the claim form? What does that do? The claim form quantifies the claim. It's just an administrative document, much like what in bankruptcy. So your point that they were presented by that form, they were not aware of a choice between I am choosing assignment versus this involuntary petition. They just get a form as if a process is already underway and they just fill it out? That's correct, Your Honor. The assignment preceded the bankruptcy. The mailings went out 30 days after the assignment before the bankruptcy. And the trust document required there be an assent and a claim form sent. There was no assent. And the claim form doesn't say by signing this I hereby assent. In my remaining minute, I'd like to turn to the allocation issue. And this has two parts. One, what do we do about the requirements in an answer to raise your affirmative defenses if we're going to import the affirmative defenses of 547, the preference statute, into an involuntary petition? But that seems peculiar because you are claiming, I'm sorry, the debtor responsible for the claim. He says there's a numerosity problem, right? And then you would say, but there's no numerosity problem because some of those creditors should be cut off the list. And then they would say, but no, they should be on the list because there's a defense. I don't see how all that plays out in a pleading. Well, the reason, and that's a good question, but I think there's some suggestion that that's what's intended. Rule 1003 requires there to be a list of creditors with the answer. And 303B doesn't use the word creditor. It uses the word holder. And then it splits them into the holders and then the holders who are not excludable. And therefore, the debtor is in the position of knowing who's excludable and who isn't. Judge Multicombe, I'll give you another minute. I am interested in hearing about the burden of proof because I thought that was a better argument than the plea. So with that, thank you, Your Honors. The burden of proof is the same issue, but now at the trial phase, which is I'll take ordinary course, the defense. The ordinary course defense has two avenues. And the debtor normally, or the preference recipient, only has to win on one. Did I get paid under terms that are within industry norms, or did I get paid within our relationship, which might have been spotty? Who knows? By flipping the burden of proof, as the bankruptcy judge did, onto the petitioning creditors, it requires the petitioning creditors to negate both of those. Well, to negate both means I'd have to do discovery on what the industry norm is, which was not allowed in this case. I'd also have to do discovery, and I would want more than three years. I'd want the entire credit history on that account, and that also didn't happen in this case. I thought discovery was conducted in this case. There was discovery, but it was limited. It was limited to the issue of numerosity, and then the debtor pushed back on the petitioning creditors to say we're not going to give you our QuickBooks account. We're not going to give you all of our financial data. We're only going to give you invoices, and we're only going to go back a certain amount of time. And so with that, the judicial resources would be conserved by having proportional discovery. And the only way you can have proportional discovery, A, address it at the pleading stage, who's in play for being excluded and who's not, and then at trial, have the burden of proof on the party who's able to meet that burden of proof. The BAP found that if you read the bankruptcy court's decision really closely, in fact, she made a ruling on the burden of proof, but then she sort of did the opposite. And I sort of read that as the BAP saying this issue would be harmless anyways. Could you address that? I don't think it would be harmless, meaning if you go creditor by creditor, we'd have to knock out four creditors. And there are four creditors at least, there are more, who received payments within the 90 days that would be a prima facie preference for whom they received payments after the dissolution and wind down plan was in process. We would say that that doesn't meet the ordinary court standard. But if the burden is thrust onto the appellants, that's nearly impossible. So I do think that there was harm to that decision. Thank you. Thank you, counsel. At this time, would counsel for appellee HH Technology please introduce himself on the record to begin. May it please the court, Francis Morrissey on behalf of both appellees, HH Technology Corp., as well as the S&E for the Benefit of Creditors, Craig Jalbert. I'm sure the panel wants to get into the merits of the statutory argument. I'm prepared to do that. But while it's fresh in my mind, I'd like to address some of the points that the appellant made. Number one, there's no dispute on this record that DFT got notice not only of the Banksy case, but of the joinder deadline. And I'm going to direct the court to the record. It's the first volume of a six-volume record on page 283. Attorney Wells, who represented DFT at all times relevant during this case, monitors the case, averts in support of the motion to join the involuntary petition for good cause that in April 22nd, I received notice of the Banksy proceeding and of the creditor joinder deadline. So in April, DFT had actual notice of the creditor joinder deadline. And he continues in his affidavit. At the time, DFT believed that its interest would be adequately served by the state law assignment, which according to the letter I received from Mr. Jalbert was a valid alternative to bankruptcy. How would they have known of the transfers that at least are questionable? That's a good question, and there's an answer to that question. Attorney Wells said he was monitoring the case, and before the joinder deadline, Rokita had made allegations of the preferential transfer. So there was material on the record available from Pacer, even if you were located in Texas, you could pull it right up. The second response is that there are preference issues in every Banksy case. I've been a Banksy lawyer for 30 years. Every transfer made within the 90 days is looked at by an estate fiduciary. And in fact, the Banksy Code was recently amended, 547B. Typically, every creditor that received a payment in the 90-day period gets a demand letter and oftentimes a complaint, and oftentimes on the day the statute of limitations is about to run. This practice was deemed to be abusive, and Congress amended 547B to say that the trustee needs to utilize diligence and consider defenses to these payments. So in every case, if there's any payments within the last 90 days or the 90 days prior to the commencement of the case, there's a preference issue. So it's sort of in the background if anybody does insolvency law, but this particular creditor, DFT, had the opportunity to learn about this from the papers that were filed on Pacer. And in his affidavit, in support of belatedly joining the petition, he aversed that he was actively monitoring the petition. And there's more. Rokita asked for a 30-day extension to the jointed deadline, the May 23rd jointed deadline. In their request for the 30-day extension, Rokita represents to the Banksy Court that it was in communication with all of the creditors. And on top of that, if you look at the Court's jointed deadline order, the S&E wasn't responsible for serving that order. The alleged debtor wasn't responsible for serving that letter, that jointed deadline order. Rokita was required to serve the jointed deadline order. And the Court expressly authorized Rokita to contact all of the creditors, a handful, 15, 12 or 15 creditors. Counsel, may I ask you about that? I find that very interesting because my initial, the point that Rokita was authorized to reach out to all of these identified creditors, because it struck me that opposing counsel had a good point in saying that if they're really going to deal with these affirmative defenses, how can they possibly do that without doing discovery so that they can understand the relationship between the debtor and all of these creditors? I think you're telling me that they actually had a way of doing that by reaching out to the creditors in the way that you're describing. Is that correct? You're correct, Your Honor, but there's more. Rokita, who's the 800 pound gorilla in the case, who has a 14 million dollar Polish default judgment, Rokita subpoenaed every single domestic creditor. So there were phone calls, there was an affidavit, or not an affidavit, but a request for an extension to the jointed deadline where it was represented that they were having a hard time getting truth to the right people in some instances, and it was followed on with subpoenas. And to say that they didn't have a fair opportunity to challenge the preference offenses, I respectfully disagree. I brought a box. It's right there. I couldn't fit. I was paranoid that I wasn't going to be able to find a record site. I was at an appeal once in California. It was a horror show. The guy couldn't get the record on the plane. There's six big volumes in the record, and most of it are exhibits at the trial. And the exhibits at the trial consist of all of the payment records from the challenge. And by the way, Rokita and the other timely creditor, Shanghai Mazzarato, they challenged, with one exception, every single creditor on the alleged debtors list. And they had documents that were subpoenaed from all of the domestic creditors, and they were able to depose the assignee and the two principals of the alleged debtor extensively. And to make out a new value defense under 547C, or to make out an order of course of business defense under 547C, all you really need are the payment records. Was this subsequent new value furnished after a challenge payment? That's right there in the bank statements that were available and that were subpoenaed and that were part of Judge Bosswick's two-day evidentiary hearing. Similarly, were the payments made during the 90-day preference period similar to the payments made prior to the two collection efforts? Well, we had witnesses. Jalbert was a witness at the evidentiary hearing, and then the two principals of the alleged debtor, AGH Tech, were witnesses. So I respectfully submit that Rokita and Shanghai Morimatsu had a plenary opportunity to challenge the defenses to these alleged preference transfers. Is this part of the question of whether the burden of proof made any difference? I mean, that it was all out there? And that's another point that I should emphasize. You go back and take a look at Judge Bosswick's opinion. Every creditor was challenged, and Judge Bosswick made findings of fact with respect to every creditor. Not every creditor received an allegedly avoidable transfer, and there's language that the burden was on the petitioners to show that these defenses did not apply. And I think she was correct on that allocation. I'll come back to that. There's a First Circuit decision that supports that allocation of the burden. But I think the BAP correctly pointed out, and the judge correctly pointed out a few minutes ago, Judge Bosswick did more. She went creditor by creditor, and she made specific findings of fact. This particular creditor was a utility. After the challenge payments, there was additional utility services furnished. This particular creditor was a landlord. This timing in this payment was consistent with the timing of payments prior to the preference period. So she made a fair reading of that. There's detailed findings of fact about the defenses that weren't addressed at all in the appellant's brief. Back to the burden of proof. And again, it was brought up by the panel a few minutes ago. We're not in a avoidance action litigation. This is not an adversary proceeding to avoid and recover allegedly preferential transfers. This litigation that's a subject matter of this appeal is a contested involuntary petition. And an alleged debtor, and the representative of an alleged debtor, like an assignee, there are certain defenses that can be interposed to a petition for involuntary bank relief. One is that the petitioner has a disputed claim. One is that there are more than 11 creditors and not a sufficient amount of petitioners have joined the petition. Another form of defense to an involuntary petition rather than an avoidance action claim is the debt is a non-profit or a family fine. So those defenses that were applicable to this case were properly asserted. And you can't, I think it's improper to convert a contested involuntary petition litigation into an adversary proceeding to recover preferences. Now I'll turn to the elephant of the room. Whether 303C precludes, precluded the Banksy Court from setting a reasonable jointed deadline. And I'd agree with some of the questions that were posed in the last discussion. 303C sets an outside deadline. 303C on its face doesn't prohibit judges from exercising their case management authority to set an earlier deadline. And when you go beyond the statute, which doesn't deal with the court's case management authority to set a jointed deadline. The problem is, of course, I asked the question that helped that side, but I think I can ask it to help their side now. So it sets a beginning and it sets an end. After the filing, but before dismissal, and then it says the party may join. So one way to read that is to say between those bookends, the party has the ability during that period between the bookends to join, may join. It is their option to do so. Why is that not a fair view? Bookends suggests an outside deadline. In addition, the statute doesn't just say you can join any time before the case is dismissed. It also says you can join any time before an order for relief is entered. What would be the point of joining after an order for relief from Senate was entered? I think that language suggests it's an outside deadline, a bookend, not a limitation on a bankruptcy judge's ability to manage your docket. They don't want people coming in after the case is over and saying I was shut out. They don't want that. Motion to reopen the case. And those motions to reopen the case happen frequently in bankruptcy cases. A creditor is discovered or didn't get notice. The creditor didn't get notice or something. That would deal with that issue. I'll just finish the point. Creditor doesn't get notice in the first case. Order for dismissal is entered. New creditor is discovered. More information comes to light. That creditor said, jeepers, I would have joined that petition. Well, the statute says you can't resurrect the petition. You can persuade others to start a new petition. You can start a new case. But you can't resurrect the old case. So that's what I think the function of that language is. I interrupted you, Judge. I apologize. There are all sorts of policy reasons that support reading the statutory provision as establishing an outer limit. But I get the feeling that you are importing policy reasons to try to contravene what seems to be the clear language of the statute. And the law is clear that the statute has got to prevail over the regulation. So what is it about that language that supports this outer limit reading that you ask us to adopt? I would argue that it's the absence of an express prohibition on the courts using their well-known case management authority under Section 118, which incorporates by reference Rule 16 and Rule 24. The other rule that is relevant is Rule 1013, which directs, which mandates the Banksy courts to adjudicate involuntary petitions forthwith as soon as practical because whether the case is dismissed or not, involuntary cases cause real damages to operating businesses that shouldn't belong in bankruptcy. Improper involuntary cases also cause damage to fiduciaries like an assignee or other Banksy law custodians who are trying to wind down a business. Being in involuntary bankruptcy makes it harder to collect receivables. It creates questions about the title that the assignee had to monetize assets like intellectual property. So an involuntary bankruptcy causes real damages whether it's dismissed or not. And there's an imperative, a longstanding imperative that courts adjudicate involuntary petitions as soon as possible. And you alluded to it a few minutes ago. It's called in the DSC case, the Banksy case that decided it, but the Sixth Circuit adopted this scenario by reference. It's called the nightmare scenario in our brief. You could have someone join while the, you have a scenario where the court has an evidentiary hearing, takes on, in our case it was two days of evidence, hundreds of pages of exhibits. It's under advisement and someone could join during that period. Well, that doesn't end the litigation. The mistaken premise of the appellant's brief is it doesn't end the litigation. The alleged debtor can challenge the eligibility of someone to join a petition. If you have a disputed claim, you're not eligible to join an involuntary petition. Let's say you had a $10,000 claim and you want to join the petition. If $100 of that claim was disputed under applicable Fourth Circuit law, and the site is the Fostello case, H16F31, even a tiny dispute about the amount of a claim renders that creditor ineligible. I'll conclude this way. By enacting 3003C, Congress could not have intended to deprive Banksy courts of the power to prevent chaos in involuntary cases. That's not what was intended. Thank you. Unless the Court has any other questions. No, thank you. Thank you, Counsel. At this time, would Counsel for the Appellants please reintroduce himself on the record. He has a one-minute rebuttal. Thank you, Your Honors. Ilyas Rona, again, on behalf of Appellants. I'll just respond briefly to an earlier question of Judge Aframe. Bankruptcy Rule 1003's advisory committee notes refer to Section 303C conferring or granting permission to a creditor to join at any time. That's not that. I'm no expert in bankruptcy. So what's happening there is Congress passes a statute that says what it says. There's a bankruptcy rule that's then subbed. Who makes those? The advisory committee is. But they write rules. They write rules and comment on them. And these rules are about how to facilitate the code. And this section of the code says, get these things done as soon as practicable, right? Correct. And petitioning creditors can join it. And then the advisory note to that says, has the any time language I noted was missing. Correct. Two, I want to clarify the record. PCC did send the joinder deadline notice. However, debtor was assigned the responsibility of sending the hearing date notice. I have a question about the any time. So what value do we give that in a, I mean, post, I don't know, post-Chevron? Like, what is that? Is that, do we defer to that? Does that inform my thinking about the plain statutory text? How do I use that? The advisory committee notes date from 1983. They weren't enacted contemporaneously with the code. There was a delay. That, along with the legislative history that we cite, is the best evidence of what Congress intended at the time. I think what has happened in the 25, or I'm sorry, I'm older than I thought, the 45 years or so that have passed is that we've lost touch with what was the law, and there was no intent to ever change that law. Thank you. Thank you, Your Honors.